# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

JODITH HUNTER,

      Plaintiff,

v.                            Civil No. 02-986 WJ/LFG-ACE

VICKIE LESTER, and the
BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS, for the
ALBUQUERQUE PUBLIC SCHOOL DISTRICT,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## ON DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT
## AND DEFENDANT LESTER'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendants' Joint Motion for Summary Judgment [Docket No. 63] and Defendant Vicky Lester's Motion for Summary Judgment on Punitive Damages [Docket No. 64]. Having reviewed the submissions of the parties and being otherwise fully advised, I find that Defendants' joint motion is well taken and shall be granted. As the granting of the joint motion disposes of all claims, Defendant Lester's motion is now moot and shall be denied as such.

## INTRODUCTION

The facts alleged by Plaintiff, if true, indicate a management style on the part of Defendant Lester that is so egregiously autocratic that it offends common sensibilities. Moreover, and assuming the truth of Plaintiff's alleged facts, the continued acceptance by officials of Albuquerque Public Schools ("APS") of Defendant Lester's methods and conduct as an

elementary school principal is incomprehensible.  However, general rudeness and offensive behavior by a public school principal, no matter how severe, does not necessarily constitute a violation of the Constitution or laws of the United States.   Furthermore, notwithstanding the repulsive nature of the facts alleged by Plaintiff, they must be analyzed within the parameters of the claims asserted by the Plaintiff.

In the instant case, Plaintiff filed her Complaint in federal court alleging (i) that Defendants retaliated against her for her stance, speech and activity protected under the First Amendment, (ii) that Defendant APS breached the covenant of good faith and fair dealing implied in Plaintiff's written contract of employment with APS, and (iii) that Defendants are liable under the Fourteenth Amendment and 42U.S.C. §1983 for supervisory and policy liability.   Defendants filed a joint motion for summary judgment arguing that they are entitled to summary judgment on all of Plaintiff's claims.   Defendant Lester filed a motion for summary judgment on Plaintiff's claim of punitive damages.

**BACKGROUND**

At the times material to this lawsuit, Plaintiff was licensed and certified to teach special education in the State of New Mexico.  Albuquerque Public Schools (APS) employed Plaintiff for the 2001-2002 school year pursuant to a contract of employment.  Plaintiff also worked for APS during the 2000-2001 school year.  For both school years, Plaintiff was a special education teacher at Pajarito Elementary School where Defendant Lester was the principal.  Plaintiff was a member of a teacher's union while employed at APS.

Plaintiff was, by all accounts, a good teacher.  Her prior principal at an elementary school in Belen, New Mexico characterized Plaintiff as an excellent teacher.  A parent of one of

Plaintiff's students at Pajarito credits Plaintiff with her son's educational progress.  Plaintiff received a Staff of the Month award while teaching at Pajarito.  While teaching at Pajarito, Plaintiff was admitted to two graduate programs in educational administration and enrolled in the program at Highlands University.  Plaintiff received excellent grades in her graduate studies, and one of her professors concluded that Plaintiff's skills would make her an asset to any school.  Defendant Lester was impressed with Plaintiff's teaching abilities.

Gerri McCloud was the PTA president at Pajarito during the 2000-2001 school year.  Several of her grandchildren were enrolled at Pajarito.  Over the winter holidays in December 2000, Ms. McCloud was stopped by WalMart security when she was leaving the store.  She had a shopping cart full of purchases, but a package of toilet paper in her shopping cart had not been purchased.  According to Ms. McCloud, the cashier had missed the package of toilet paper.  However, security took Ms. McCloud into the security office, accused her of stealing the toilet paper, and took pictures of Ms. McCloud and the toilet paper.  Ms. McCloud reported this incident to Defendant Lester to preclude Lester hearing about it from another source.  Ms. McCloud was concerned that Defendant Lester might hear about it from Plaintiff because Plaintiff was working at WalMart to supplement her teacher's salary.

Ms. McCloud was aware that other parents in the school were circulating a petition against Defendant Lester.  Ms. McCloud initially refused to endorse the petition and encouraged others to try to work directly with Defendant Lester to work out the problems.  Defendant Lester called Ms. McCloud into her office and asked for information about the petition.  Defendant Lester told Ms. McCloud that she should have reported everything about the petition including the persons involved.

In the spring of 2001, Ms. McCloud observed a teacher pointing out items on a standardized test to a student.  Ms. McCloud's grandson told her that teachers were pointing out correct answers.  Ms. McCloud expressed concerns to Defendant Lester that Pajarito teachers were artificially inflating standardized test scores by pointing out correct answers to their students.[1]  Ms. McCloud perceived her relationship with Defendant Lester as "going down hill" after she expressed these concerns.

Ms. McCloud was up for reelection to the PTA presidency in the Spring of 2001.  Defendant Lester expressed support for another candidate who happened to be her secretary's husband.  Defendant Lester was aware that Plaintiff worked part-time at WalMart and asked Plaintiff to go to the WalMart security office and obtain copies of everything related to the WalMart incident involving Ms. McCloud.[2]  Plaintiff refused to comply with Defendant Lester's request.  Plaintiff avers that she told Defendant Lester, "No, I could never get into the security office and that ethically I wouldn't do it.  I just can't and won't."  Plaintiff also attests that she told Defendant Lester, "No, I couldn't get into the security office if I tried.  I am a merchandiser, not an employee."

Other PTA members began to refer to the WalMart incident at PTA meetings.  Ms. McCloud ultimately withdrew her candidacy because of the rumors regarding the WalMart incident.  Ms. McCloud was threatened with a referral to CYFD if she enrolled her grandchildren

---

[1]Plaintiff provides evidence to support that teachers were, in fact, helping students cheat on the standardized tests and that Defendant Lester had pressured at least one teacher to assist students with the standardized tests.

[2]Plaintiff provides evidence to support that Defendant Lester asked at least one other Pajarito teacher or staff member to go to the WalMart and see if Ms. McCloud's picture was displayed in the store.

at Pajarito for the following school year.  Ms. McCloud was then banned from the Pajarito campus.

For the remainder of the 2000-2001 school year, after Plaintiff refused to obtain information from WalMart, Defendant Lester made derogatory remarks to Plaintiff and about Plaintiff to others, would not allow Plaintiff to serve on an APS committee, would not let her make presentations or even ask questions during meetings, postponed Plaintiff's work evaluation, and stood Plaintiff up for scheduled appointments.

When Plaintiff returned to Pajarito for the 2001-2002 school year, her classroom had been reassigned and her belongings were scattered.  Plaintiff attempted to transfer to Polk Middle School.  Defendant Lester announced in front of several people that Plaintiff would not get the job at Polk, that she had told a person involved in the transfer decision that Plaintiff was not ready, and that the person she spoke with would rely on her assessment.  Defendant Lester later told Plaintiff that she would make sure Plaintiff did not get the job.

Throughout the fall of 2001, Defendant Lester interfered with Plaintiff's graduate studies by refusing her access to data and failing to timely write Plaintiff a required letter of recommendation.  At the thought of having to go to work, Plaintiff began on an almost daily basis to stop on the side of the road on the way to work to vomit.  Because of the obstacles posed by Defendant Lester, Plaintiff decided to postpone her graduate internship until the summer 2002 break.  Plaintiff did complete the internship during the summer 2002.  The optimal time for internships is during a school year so that the intern gets the experience of opening and closing a school.  Because Plaintiff did a summer internship, Highlands University has delayed accepting the internship toward Plaintiff's degree.

Denise Barela is the mother of Trinidad Sena. Trinidad had been at Pajarito for pre-school through a special program. Ms. Barela wished him to attend first grade at Pajarito for continuity even though she did not live within the district. She submitted the proper paperwork for a transfer and registered Trinidad at Pajarito where he was placed in Plaintiff's class for the 2001-2002 school year. Ms. Barela received a call from Defendant Lester's secretary informing her that Defendant Lester was not accepting transfer students. Ms. Barela then moved into the district. Defendant Lester asked Plaintiff to contact Ms. Barela and obtain proof that Ms. Barela was living within the district. Plaintiff contacted Ms. Barela and Ms. Barela provided paperwork. Defendant Lester or her secretary asked Plaintiff three more times to contact Ms. Barela about providing additional records. Plaintiff believed it was the job of the administration to communicate directly with Ms. Barela on this issue; it was not the responsibility of the classroom teacher. The last time she was asked to contact Ms. Barela, Plaintiff told Defendant Lester that she would not do it because she had already done it and would not do it again.

Ms. Barela was concerned that Trinidad was not receiving all of the special educational services he was entitled to. According to Plaintiff, these concerns were well founded. Ms. Barela made several attempts to meet with Defendant Lester and contacted the APS Service Center frequently. Ms. Barela believed that nobody at APS wanted to help her. The more she complained, the more trouble she had with Defendant Lester. Ms. Barela received phone calls from people threatening that she would be hurt if she did not stop harassing Defendant Lester. By January 2002, Ms. Barela began organizing a petition and protest to remove Defendant Lester as principal of Pajarito. Ms. McCloud joined in the protest.

Ms. McCloud made written complaints to APS about being banned from campus and also

spoke with Acting Superintendent Joe Vigil.  Ms. McCloud had learned from Plaintiff that

Defendant Lester had asked Plaintiff to obtain information on the WalMart incident.  Ms.

McCloud spoke with Acting Superintendent Joe Vigil about being banned from the campus, and

communicated with him about Defendant Lester's attempt to have a teacher obtain the

information from WalMart.  Mr. Vigil asked for the teacher's name, and Ms. McCloud informed

him that Plaintiff was the teacher.

Defendant Lester was informed by APS of Ms. Barela's complaints that Trinidad was not

receiving all of the special educational services he was supposed to.  Defendant Lester was also

informed by APS of Ms. McCloud's complaint about Plaintiff being asked to obtain information

on the WalMart incident.  Plaintiff's name came up in connection with both of these complaints.

Defendant Lester sent a letter to Plaintiff calling Plaintiff in for a meeting on Ms. Barela's

and Ms. McCloud's complaints.[3]  The meeting occurred on April 8, 2002.  On Wednesday April

10, 2002, Defendant Lester again met with Plaintiff.  According to Plaintiff, Defendant Lester

pressured her to tell Ms. Barela that Trinidad was receiving all of the special educational services

to which he was entitled even though Plaintiff knew he was not receiving all of the services.

Plaintiff contends that Defendant Lester told her to come up with a "plan" to show a united front

and discredit Ms. Barela's complaints to the APS service center.  Plaintiff did not develop such a

"plan."  During her deposition in this case, Plaintiff testified that she believed it would have been

unethical and a lie to tell Ms. Barela that Trinidad was receiving the services to which he was

---

[3]Plaintiff contends that there is a disputed issue of material fact as to whether Defendant
Lester called this meeting on her own initiative or was instructed to call this meeting.  This fact is
not material because it would not affect the outcome of this case.  See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).

entitled.  However, Plaintiff provides no evidence that she communicated to anyone at the time about her reasons for refusing or failing to develop a "plan."

On April 15, when Plaintiff had not come up with a "plan,"  Defendant Lester sent a formal "supervisory referral" to the  APS Employee Assistance Program stating that Plaintiff was being placed on administrative leave for inappropriate behaviors including threatening comments to parents and to Defendant Lester.[4]  According to Plaintiff, these allegations were false.

On the afternoon of Monday April 15, 2002, Defendant Lester arranged to have an APS police officer escort Plaintiff from the Pajarito campus.  Defendant Lester made the decision to have an APS police officer conduct Plaintiff from the premises without any input or approval from anyone with APS Human Resources.[5]  Plaintiff had no opportunity to provide a transition to a new teacher for her young disabled students.  Rumors spread that Plaintiff had been removed from the school for something extremely serious, and Plaintiff believes her professional reputation was "shot."

On April 15, when the APS police officer approached Plaintiff to escort her from the

_____

[4]Plaintiff's Statement of Material Facts (SMF) points out that Defendant Lester's allegations changed in substance over time.  See Plaintiff's SMF ¶¶ 38-42.  These are facts that are relevant only to the issue of Defendant Lester's credibility so are not relevant on summary judgment.  The Court will assume for purposes of the motion that all of the allegations are false.  Additionally, Plaintiff points out disputed issues of fact with regard to whether Defendant Lester was instructed to leave allegations out of various reports and to whom Defendant Lester reported these allegations.  See Plaintiff's SMF ¶¶ 45, 46.  These facts are not material as they would not affect the outcome of this case.  See Anderson, 477 U.S. at 248.

[5]Defendant Lester claims that Maryann Domina of APS Human Resources agreed with her decision.  However, Ms. Domina's testified that she had no knowledge on April 15 that Plaintiff was being placed on administrative leave and made no recommendation to Defendant Lester other than to come into the APS Human Resources office to discuss the problems with Plaintiff.  Plaintiff's version of the events, which is supported by the evidence and will thus be assumed for purposes of this motion, is that Defendant Lester made the decision unilaterally.

8

campus, the officer gave Plaintiff some type of memorandum notifying her that she was being placed on administrative leave with pay.  The record does not make clear what document was given to Plaintiff.  The only official memorandum addressed to Plaintiff regarding her administrative leave is dated April 16 and makes the administrative leave effective April 16.  This memorandum is signed by Ron Williams of APS Human Resources.  On April 17, Defendant Lester wrote a letter to Maryann Domina reporting that Plaintiff had made a threat against her on April 10, 2002.

Plaintiff and Defendant Lester were called to APS Human Resources to give their respective statements about Defendant Lester's allegations sometime after April 15.[6]  Plaintiff attended the meeting with counsel.  On the way to the meeting, Defendant Lester passed Plaintiff's vehicle at an intersection and flipped Plaintiff the finger.  Plaintiff complained of this to Maryann Domina of APS Human Resources.  Her complaint was never investigated.

After Plaintiff was removed from Pajarito, Ms. Domina of APS Human Resources told Plaintiff she would look for a special education elementary level position for Plaintiff to fill for the remainder of the 2001-2002 school year.  However, there were no permanent positions available for the remainder of the school year, and Ms. Domina knew this when she represented to Plaintiff that she would look for such a position.  On April 30, 2002, Plaintiff was placed on temporary assignment as a substitute teacher roving from school to school.  Plaintiff suffered no loss of pay or benefits as a result of the temporary assignment, and she served out her contract term for the 2001-2002 school year.  Plaintiff did have difficulty getting her paychecks after being placed on substitute status because her checks were still being delivered to Pajarito.

---

[6]The record does not contain any reference to the date of this meeting.

9

May 23, 2002 was the last day of classes for the 2001-2002 school year.  Thus, at the time of Plaintiff's temporary assignment, there were only seventeen days of school remaining in the school year.  Of those seventeen days, Plaintiff used sick leave or professional leave for ten days. Plaintiff used sick days for migraine headaches she suffered due to the stresses of work.  Plaintiff was entitled to use these sick days as the accrued benefits of her position.  While Plaintiff was using sick leave, Ms. Domina called Plaintiff and demanded documentation of her physical condition.  Ms. Domina scrutinized and questioned Plaintiff's use of sick leave more harshly because of Plaintiff's substitute status.  Plaintiff asserts that Ms. Domina was angry and intimidating when she called to request the documentation.

Ms. Domina had communicated to Plaintiff that her assignment as a substitute was temporary and that APS was looking for a long-term position for Plaintiff in the South Valley. Plaintiff, believing she would not be given a teaching contract with APS for the 2002-2003 school year, sought employment elsewhere and ultimately accepted a teaching position in Las Vegas, Nevada.  Plaintiff's belief that she had not been re-hired was based on the fact that she had not received a letter of re-employment from APS before the end of the 2001-2002 school year and was aware that others had received re-employment letters.  Plaintiff's employment for the 2002-2003 school year was, in fact, approved by the Board of Education at a public meeting on April 25, 2002, and a re-employment letter for Plaintiff was sent to Pajarito.  However, Plaintiff was unaware that the Board of Education had approved her re-employment, and Plaintiff did not receive the re-employment letter because she was no longer assigned to Pajarito and Defendant

Lester sent the letter back to APS Human Resources.[7]  Additionally, Plaintiff received no information or directions from APS regarding a placement for the 2002-2003 school year or a school to report to at the beginning of the school year.  Ms. Domina admits to having failed to follow through on finding a placement for Plaintiff for the 2002-2003 school year.

While Plaintiff did not receive a letter of re-employment, neither did she receive a letter of termination.  In spite of having no information about her employment status, Plaintiff made no attempt to contact anyone at APS to inquire about her employment status for the 2002-2003 school year.  Plaintiff states that this was due to the unpleasant nature of her previous contacts with Ms. Domina at Human Resources.  Plaintiff also made no attempt to inquire of her union regarding her continued employment with APS.  Plaintiff began employment with the Las Vegas, Nevada Public Schools on August 14, 2002.  Plaintiff still has nightmares.

Plaintiff provides a plethora of detailed evidence with regard to other teachers and administrators at Pajarito who had unpleasant experiences with Defendant Lester.  The Court will not recite these facts with the detail provided by Plaintiff but will, instead, give an abbreviated summary of those facts.  Melissa Salazar, assistant principal at Pajarito almost nine years ago from July 1994 through January 1995, had difficulties with Defendant Lester and believed Lester retaliated against her because she refused to falsify records to inflate the number of students

---

[7]Plaintiff offers evidence that the letter should have been sent back to the records department rather than the human resources department.  This fact is not material to the issue of Plaintiff's belief that she had been terminated from employment with APS.  Plaintiff also submits evidence that Defendant Lester completed a Teacher Evaluation Report in May 2002 that answered "NO" to whether Plaintiff was recommended for re-employment.  However, Plaintiff does not aver, and there is no evidence, that Plaintiff was aware of this report.  Thus, the fact of the report is also not material to the issue of Plaintiff's belief that she had been terminated from employment with APS.

eligible for bilingual education in order to increase school funding. The alleged retaliation included an incident in which Defendant Lester called Ms. Salazar into the office and told her the police were on the way. Defendant Lester then informed Ms. Salazar that Ms. Salazar's brother had beaten up another school employee in a parking lot in Santa Fe over the weekend. A police officer did arrive, and Defendant Lester reported her allegation regarding Ms. Salazar's brother. Ms. Salazar notified the police that she would get an attorney if the officer handcuffed her or even filed a police report against her. In November 1997, then Associate Superintendent Analee Maestas sent Defendant Lester a letter expressing concerns including that Lester engaged in frequent intimidation and degradation of Pajarito staff, harassed staff who opposed her philosophy or questioned her decisions, and used her status as principal to belittle her staff. In 2001, Pajarito teacher Tom Kirchgessner had difficulty with Defendant Lester and complained in writing to APS Associate Superintendent Diego Gallegos.[8] The complaint has a date stamp of May 16, 2001 in the lower right corner. On May 18, 2001, Defendant Lester gave Mr. Kirchgessner a "4th Notice" that his duty day begins at 8:40 a.m. From the spring of 2000 until October 2001, Pajarito employee and parent Cherolyn Work had difficulty with Defendant Lester because Ms. Work chose to send her daughter to Polk Middle School rather than the Pajarito Academy. Defendant Lester's alleged retaliation against Ms. Work included scheduling Ms. Work's work hours to prevent her from serving on APS committees, scheduling her as playground monitor during recess, refusing any of Ms. Work's scheduling requests, tampering with her payroll, and

---

[8]The only evidence of the substance of the complaint is Mr. Gallegos' deposition testimony and an unsigned, unattested, typewritten complaint allegedly written by Kirchgessner and sent to Mr. Gallegos. This evidence is hearsay. Thus, the Court will not consider the substance of Mr. Kirchgessner's complaint.

making false statements about Ms. Work to other teachers and to Nursing Services.

Former Associate Superintendent Maestas has testified that school principals are the persons responsible for the orderly operation of the schools.  Assistant Superintendent Gallegos has stated that Defendant Lester, as principal of Pajarito has ultimate responsibility for the instructional program and the school's community relations.  In May 2000, Gallegos also stated that APS supports Defendant Lester's leadership and direction.  Former Associate Superintendent Maestas believed that Defendant Lester felt entitled to do as she pleased.  Maestas observed that Defendant Lester often received no supervision.

Persons who complained to APS about Defendant Lester often believed that APS' responses to complaints were unsatisfactory.  For instance, Ms. Barela, the mother of Trinidad, felt that nobody at APS wanted to help her.  Former Pajarito Assistant Principal Salazar avers that former Associate Superintendent Maestas and Assistant Superintendent Gallegos both contacted her and asked her to relate her experiences with Lester and answer questions, but that, to her knowledge, APS took no further action.  Audrey Pennington, former teacher at Pajarito from 1993 to 1997, complained to APS administration about Defendant Lester's conduct toward her.  Pennington was told to "grieve."  Pennington felt that she got no back up or support from the APS administrators.  Pajarito teacher Tom Kirchgessner filed an internal complaint with APS Equal Opportunity Services and was given an initial interview.  He was told that the investigation had been assigned to someone.  However, he never heard anything more and, as far as he knows, his complaint was never investigated.  Former Pajarito employee and parent Ms. Work went to APS Equal Opportunity Services to file a complaint against Defendant Lester for sexual harassment and was told that her claim would be extremely difficult to prove and that others had

tried to file complaints against Lester and never won.  Ms. Work declined to file her complaint.

Defendant Lester made an unsolicited admission to former Associate Superintendent Maestas that she had a goal when dealing with children in her office to scare them until they urinated in their pants, and that she had been required to replace her couch with a wooden bench because it had become stinky from this practice.  Maestas reported this through her chain of command at APS and was instructed to continue to document.  However, Defendant Lester received no formal discipline.

In November 1997, Maestas gave Defendant Lester a memo outlining concerns that had been brought to the attention of APS Human Resources.  Defendant Lester became furious and stormed out of the meeting when Maestas gave her the memo.  After Defendant Lester received the memo, she required Ms. Work to send a rebuttal letter to Ms. Maestas.  In 1998, APS attempted to transfer Defendant Lester to another school.  No other school hired Lester.

**LEGAL STANDARD**

Summary judgment is properly regarded not as a procedural short cut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure a just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  Under Fed. R, Civ. P. 56(c), the movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleading depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  With or without supporting affidavits, the movant may meet its Rule 56 burden by pointing out to the court that the nonmovant "fail[ed] to make a showing sufficient to establish the existence of

14

an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322-23; Lujan v. National Wildlife Federation, 497 U.S. 871, 884-5 (1990).

Once the movant has met its Rule 56 burden, the burden shifts to the non-moving party to establish the existence of a genuine issue for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-7 (1986). On summary judgment, the court must view the evidence in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court, however, cannot assume that a disputed issue of material fact exists if there are insufficient facts to support the non-movant's allegations. Lujan, 497 U.S. at 888. By its terms, Rule 56(c) provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 248-49. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The non-movant, moreover, cannot satisfy its burden with "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, "conclusory allegations," Lujan, 497 U.S. at 888, unsubstantiated assertions, Wilson v. Meeks, 52 F.3d 1547, 1553 (10th Cir. 1995), or the "mere existence of a scintilla of evidence, in support of the [nonmoving party's] position," Anderson, 477 U.S. at 252. To meet its Rule 56 burden, the nonmovant must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. If the nonmovant fails to show that there is genuine issue as to any material fact, the movant is

15

entitled to summary judgment as a matter of law.  Id. at 322.

The defense of qualified immunity is designed to shield public officials from erroneous suits as well as liability and protects all but the plainly incompetent or those who knowingly violate the law.  Holland v Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001); Hinton v City of Elwood, Kansas, 997 F.2d 774, 779 (10th Cir. 1993).  For this reason, special standards apply to a summary judgment motion raising the defense of qualified immunity.  Hinton, 997 F.2d at 779.  When a defendant asserts a qualified immunity defense, Plaintiff bears the initial burden of making two showings. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001); Holland, 268 F.3d at 1185.  First, a plaintiff must show that a defendant's alleged actions violated a constitutional or statutory right.  Medina, 252 F.3d at 1128.  The Court, in determining whether this showing is made, must assess whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional or statutory right.  Holland, 268 F.3d at 1185.

If a favorable view of the alleged facts shows the violation of a constitutional or statutory right, the plaintiff must then show that the right was clearly established at the time the allegedly wrongful conduct occurred.  Id. at 1186.  The contours of the right must have been sufficiently clear at the time such that a reasonable official would have understood that his or her conduct was unlawful.  Id.  A constitutional right is clearly established for qualified immunity purposes when there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains.  Camfield v City of Oklahoma City, 248 F.3d 1214, 1228 (10th Cir. 2001).  In order to carry his burden, a plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it.  SH.A. v. Tucumcari Municipal Schools, 321 F.3d 1285, 1287 (10th Cir. 2003).

Rather, the plaintiff must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity.  Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995). Plaintiff is not required to show that the very conduct in question has previously been held unlawful.  SH.A., 321 F.3d at 1287; Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1255-56 (10th Cir. 1998).  She is, however, required to demonstrate that the unlawfulness was apparent in light of established law.  SH.A., 321 F.3d at 1287; Baptiste, 147 F.3d at 1255-56.  Generally, this requires that the plaintiff demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited. SH.A., 321 F.3d at 1287; Baptiste, 147 F.3d at 1255-56.  If a plaintiff makes the required showings, the burden then shifts back to the defendant to make the usual showing required of defendants moving for summary judgment.  Hinton, 997 F.2d at 779.

In analyzing whether a defendant is entitled to qualified immunity, order is important; the Court must first decide whether the plaintiff has shown a constitutional violation, and only then proceed to determine whether the law was clearly established.  Roska ex rel. Roska v. Peterson, 328 F.3d 1230 (10th Cir.2003) (citing Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).  If the Court determines that a plaintiff has failed to show the violation of a constitutional right, the Court need not reach the question of whether the law was clearly established or whether individual defendants are entitled to qualified immunity.  Christiansen v. City of Tulsa, 332 F.3d 1270, 1278 (10th Cir. 2003); Lighton v. University of Utah, 209 F.3d 1213, 1221 (10th Cir.2000).

**DISCUSSION**

I.     PLAINTIFF'S CLAIM UNDER 42 U.S.C. § 1983 FOR FIRST AMENDMENT RETALIATION

Defendants' Joint Motion for Summary Judgment argues that Plaintiff cannot maintain her

claim for retaliation for three reasons.  First, Defendants urge that Plaintiff cannot establish that she engaged in any protected activity.  Second, Defendants contend that Plaintiff cannot show that she was injured in any material way.  These two arguments are relevant to the issue whether Plaintiff has shown the violation of a constitutional right.  Finally, Defendants assert that they are entitled to qualified immunity with regard to Plaintiff's retaliation claim.

A public employer cannot retaliate against an employee for exercising her constitutionally protected right of free speech.  Finn v. New Mexico, 249 F.3d 1241, 1246 (10th Cir. 2001).  A First Amendment retaliation claim is evaluated using a well-established four part inquiry in which (1) the Court determines whether the Plaintiff's speech involves a matter of public concern; and, if so (2) the Court balances the Plaintiff's interest in commenting on matters of public concern against the interests of Defendants, as employers, in promoting the efficiency of the public services it performs through its employees; then, if the balance tips in Plaintiff's favor (3) the Plaintiff must show that the speech was a substantial and motivating factor in a detrimental employment decision; then, if the Plaintiff establishes that the speech was a factor, (4) the Defendants may demonstrate that they would have taken the same action with regard to Plaintiff even in the absence of the protected speech.  Id. at 1246; Lybrook v. Farmington Mun. Sch. Bd. of Educ., 232 F.3d 1334, 1338-39 (10th Cir. 2000).

"[A] public employee's statements on issues not of general public concern are unprotected by the First Amendment."  Wilson v. City of Littleton, 732 F.2d 765, 767 (10th Cir. 1984). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement . . . ."  Id. at 768 (citing Connick v. Myers, 461 U.S. 138 (1983)).  To be protected speech, an expression must sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government.  Id. at 768.  Speech which

discloses evidence of corruption, impropriety, or other malfeasance on the part of public officials is speech on a matter of public concern. Schuler v. City of Boulder, 189 F.3d 1304, 1308 (10th Cir. 1999). Speech that seeks to expose improper operations of the government or questions the integrity of government officials is also speech on a matter of public concern. Conaway v. Smith, 853 F.2d 789, 797 (10th Cir. 1988). Additionally, First Amendment protection applies to protected speech even when a public employee communicates privately with her employer instead of expressing her views publicly. Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 413 (1979).

An employee's opposition to unlawful retaliation against another is protected speech because it discloses evidence of corruption, impropriety or other malfeasance of government officials. See Patrick v. Miller, 953 F.2d 1240, 1247 (10th Cir. 1992). An employee's refusal to comply with an employer's request is protected speech when the employee has a reasonable good faith belief that the employer's request is based on a motive to retaliate against another. See Crumpacker v. State of Kansas, -- F.3d --, No. 02-3197 (10th Cir. Aug. 8, 2003) (a retaliation claim under Title VII cannot be maintained based on an unreasonable good faith belief that the opposed conduct violated Title VII); Petersen v. Utah Dep't of Corrections, 301 F.3d 1182, 1188 (10th Cir. 2001) (noting that protected opposition under Title VII may be based on a plaintiff's good faith belief that an employer was violating Title VII). However, it is not sufficient that the subject matter of a public employee's speech be of public concern; the actual content of the speech - what is actually communicated on the topic - must itself be of public concern. Wilson, 732 F.2d at 769. An employer cannot retaliate based on protected opposition unless the employer knows that the employee has engaged in protected opposition. Petersen, 301 F.3d at 1188.

In Petersen, the plaintiff Ms. Petersen was a supervisor at a state correctional facility. One

of the people Petersen supervised was Mr. Mooney who was Native American.  Petersen's
immediate supervisor at the facility was Mr. Tansy who had a management style that was
authoritarian and abrasive.  He often used profanity and racial epithets when communicating with
employees.  When referring to Mooney, Tansy often spoke of "lazy Indian," asked whether the
natives were restless, and let out "war whoops."

During a meeting in Tansy's office, Tansy told Petersen and another supervisor, Burr, that
Mooney was due for a midterm evaluation because he was a probationary employee.  Petersen
questioned the necessity of the evaluation because she was unaware of Mooney's probationary
status.  Tansy insisted Mooney was probationary and instructed Petersen and Burr to conduct the
evaluation and consider the contents of Mooney's personnel file when filling out the evaluation
papers.

After leaving Tansy's office, Petersen questioned the propriety of reviewing the personnel
file for purposes of the evaluation.  She told Burr that she believed employee evaluations were to
be based on a supervisor's independent evaluation rather than the contents of a personnel file.
Thus, Petersen never looked at the contents of Mooney's personnel file, but did sit and discuss
Mooney's evaluation with Burr while Burr read aloud discipline reports from Mooney's personnel
file.  When Burr contacted Petersen the next day to complete Mooney's evaluation, Petersen
refused telling Burr that she could not take part in something so "wrong . . . treacherous . . . [and]
deceitful."  Id. at 1185.  Later, Petersen told the wife of the warden that she thought Tansy was
engineering a failing evaluation for Mooney.  Petersen then went to Tansy and told him that she
thought it was improper for a non-immediate supervisor to direct the outcome of an employee
evaluation.  Tansy responded by yelling at Petersen, calling her a liar, telling her that her days
were numbered, and threatening to take her out of the information loop at the facility.  Petersen

never expressed concern during the meeting that Tansy might be discriminating against Mooney because of his race or religion.

Petersen ultimately filed a Title VII claim alleging that Tansy retaliated against her for refusing cooperate on Mooney's employee evaluation and for complaining to the warden's wife about Tansy's treatment of Mooney.  The Tenth Circuit found Petersen's retaliation claim problematic because Petersen never mentioned racial or religious discrimination during the two events that she claimed gave rise to her retaliation claim.  Id. at 1188.  The court thus considered whether Petersen's failure to make any reference to unlawful discrimination precluded her retaliation claim.  Id.  The court concluded that "the absence of such a reference can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII."  Id.

Plaintiff contends that she engaged in protected speech when she refused to procure documents from the WalMart security office regarding Ms. McCloud.  Plaintiff also urges that she engaged in protected speech when she refused to report as directed to Ms. Barela about the services Trinidad Sena was receiving.  In both instances, Plaintiff argues that she was refusing to participate in Defendant Lester's unlawful attempts to retaliate against Ms. McCloud and Ms. Sena for their protected speech.

Plaintiff's assertion that Defendant Lester retaliated against her for opposing Lester's First Amendment retaliation against Ms. McCloud and Ms. Barela suffers the same weakness as the claim by the plaintiff in Petersen.  Defendant Lester could not retaliate against Plaintiff for opposing First Amendment retaliation against Ms. McCloud and Ms. Barela without knowing that Plaintiff was opposing such retaliation.  Nothing in the content of Plaintiff's refusals in the two instances or her expressions with regard to those refusals made any reference that would have

alerted Defendant Lester that Plaintiff's refusals were motivated by her belief that Defendant

Lester was violating Ms. McCloud's and Ms. Barela's First Amendment rights. Thus, to the

extent Plaintiff argues that her opposition to Defendant Lester's conduct was protected speech

because it opposed Defendant Lester's First Amendment retaliation against Ms. McCloud and

Ms. Sena, the opposition is not protected speech because the content of the speech contains

nothing that discloses Plaintiff's motive. Nothing that Plaintiff did, said or refused to do indicated

that she was opposing conduct that was unlawful under the First Amendment; thus, Defendant

Lester could not have retaliated against Plaintiff for Plaintiff's opposition to First Amendment

violations. See Id. at 1188.

   In Petersen, the Tenth Circuit was analyzing a Title VII retaliation claim rather than a First

Amendment retaliation claim, and plaintiff Petersen could not state a retaliation claim unless her

opposition to her employer's conduct was opposition to conduct made unlawful by Title VII. The

First Amendment, however, protects expressions of opposition to governmental conduct even

when the opposed conduct is not a violation of law. Thus, Plaintiff's expressions opposing

Defendant Lester's conduct would be entitled to First Amendment protection even if her

opposition was not based on a belief that Defendant Lester was engaging in First Amendment

retaliation so long as the content of her expressions was on matters of public concern.

   Plaintiff argues that her refusal to participate in these activities was speech that disclosed

evidence of corruption, impropriety or other malfeasance of government officials. While the

subject matter of Plaintiff's refusal to obtain WalMart documents may have been on a matter of

public concern, the content of Plaintiff's speech was not. Plaintiff's refusal to procure documents

from Wal-Mart was accompanied by statements to Defendant Lester indicating that Plaintiff was

both unwilling and unable to procure the documents. Plaintiff even communicated to Defendant

Lester that she believed she would be engaging in unethical behavior if she obtained the documents.  However, nothing in the content of Plaintiff's refusal discloses corruption, impropriety, or malfeasance on the part of Defendant Lester.  The content of Plaintiff's expressions does not sufficiently inform the issues as to be helpful to the public in evaluating the conduct of a government official.  Thus, Plaintiff's refusal to obtain WalMart documents is not entitled to First Amendment protection.

Plaintiff's refusal to tell Ms. Barela that Trinidad was receiving all of the special educational services he was due is similarly not entitled to First Amendment protection.  Plaintiff advances that her refusal implicated the integrity of the APS Service Center process, the reputation of Ms. Barela, and the federally protected educational rights of disabled children.  The content of Plaintiff's speech, however, discloses none of these concerns.  Plaintiff's mute refusal to comply with Defendant Lester's direction did nothing to inform pubic debate on a matter of public concern.   Thus, Plaintiff's refusal is not entitled to First Amendment protection.

The Court's analysis is on Plaintiff's claim of First Amendment retaliation, and under the requirements established by the Tenth Circuit for maintaining a First Amendment retaliation claim, Plaintiff has not met her burden of showing that she engaged in protected speech so has not shown the violation of a constitutional right.  Therefore, the Court need not address whether Plaintiff has met her burden to show an injury or whether Defendant Lester is entitled to qualified immunity on this claim.

II.   PLAINTIFF'S CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

Under New Mexico law, a covenant of good faith and fair dealing is implicit in any contract.  <u>Bourgeous v. Horizon Heath Care Corp.</u>, 872 P.2d 852, 856 (1993).  The implied covenant, however, cannot override express terms of a written, integrated contract.  <u>Melnick v.</u>

State Farm Mut. Auto. Ins. Co., 749 P.2d 1105, 1110 (1988).  The implied covenant only requires that neither party do anything that will injure the rights of the other to receive the benefit of the agreement.  Bourgeous, 872 P.2d at 856; Azar v. Prudential Ins. Co. of America, 68 P.3d 909, 925 (N.M. App. 2003) ("The implied covenant is aimed at making effective the agreement's promises.  Thus, it is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party.").

Defendants argue that Plaintiff cannot show that she was denied any benefits of her employment contract with APS.  Plaintiff's response argues that "there are substantial facts and fact issues demonstrating multiple breaches by APS."  However, Plaintiff refers to no specific facts in the record, and makes no argument regarding any specific fact issue regarding the claim for breach of the covenant of good faith and fair dealing.  The relevant terms of Plaintiff's employment contract required that she perform duties assigned to her and that she be paid a salary of $31,133.13 for the contract year.  No provision of the contract required that Plaintiff be given a particular assignment or precluded Plaintiff's transfer.  Plaintiff received her full salary and benefits for the contract year.  There is no evidence in the record creating a disputed issue of material fact on the issue of whether Defendants did anything to injure Plaintiff's rights to receive the benefit of her employment contract.  Therefore, Defendants are entitled to summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing.

III.   PLAINTIFF'S CLAIM UNDER 42 U.S.C. § 1983 FOR SUPERVISORY AND POLICY LIABILITY

Defendants assert that Plaintiff's third cause of action for supervisory and policy liability is not in and of itself a cause of action which entitles Plaintiff to recovery.  Even if a Plaintiff could plead supervisory and policy liability as a separate claim under 42 U.S.C. § 1983, a claim under Section 1983 must allege the violation of a right secured by the Constitution or law of the United

States.  Plaintiff's claim for First Amendment retaliation is the only allegation of the violation of a right secured by the Constitution and laws of the United States.  Because Defendants are entitled to summary judgment on this claim, they are likewise entitled to summary judgment on Plaintiff's claim for supervisory and policy liability under 42 U.S.C § 1983.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Joint Motion for Summary Judgment [Docket No. 63] is hereby GRANTED.

IT IS FURTHER ORDERED that Defendant Vicky Lester's Motion for Summary Judgment on Punitive Damages [Docket No. 64] is hereby DENIED AS MOOT.

_____
UNITED STATES DISTRICT JUDGE